IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

YAMIKA BANKS                                                                PLAINTIFF

v.                                                      CIVIL ACTION NO. 3:23-CV-58-SA-RP

CAVALIER HOMES, INC. and
REGIONAL ENTERPRISES, LLC                                                    DEFENDANTS

ORDER AND MEMORANDUM OPINION

On December 9, 2022, Banks initiated this lawsuit by filing her Complaint [2] against

Cavalier and Regional in the Circuit Court of Lafayette County. After removing the case to this

Court, the Defendants filed separate Motions to Compel Arbitration. *See* [18, 29]. The Motions

[18, 29] are now ripe for review. Having considered the parties' filings, in addition to the

applicable authorities, the Court is prepared to rule.

*Relevant Background*

Cavalier is a company engaged in the business of manufacturing homes. Regional is a retail

seller of manufactured homes.

On August 24, 2019, Banks purchased a manufactured home from Regional at Regional's

Tupelo, Mississippi location. The home was manufactured by Cavalier in Hamilton, Alabama. At

closing, Banks and Regional entered into a six-page purchase agreement which set forth various

terms regarding Banks' purchase of the home. As articulated by Regional, the purchase agreement

included the following:

> [T]he material terms of the transaction on page 1 of 6; a "Mold
> Disclosure and Waiver" on page 2 of 6; the "Arbitration Agreement"
> on page 3 of 6; the "Delivery Ticket/Buyer's Responsibilities" on
> page 4 of 6; the "Notice of Manufacturer's Warranty" on page 5 of
> 6; and "Buyer(s) Power of Attorney" on page 6 of 6.

[28] at p. 1-2.

As Regional's explanation indicates, the third page of the purchase agreement is labeled "Arbitration Agreement" and in pertinent part provides:

### ARBITRATION AGREEMENT

> Customer acknowledges and agrees that the transaction between the parties hereto is a matter involved in and pertaining to interstate commerce. Customer thus acknowledges that all aspects of the transaction are involved in, affect, or have a direct impact upon, interstate commerce.

> Customer and Regional Enterprises, LLC agree that any and all claims, demands, disputes or controversies of every kind or nature between them, including but not limited to, tort and contract claims; claims based on federal, state or local statute, law, order, ordinance or regulations; and claims arising from, concerning or relating to any of the negotiations involved in the transaction, the terms and provisions of agreements, the arrangements for financing, the performance of the agreements of condition of the Home, or any other aspect of the transaction shall be, at the request of either party, settled by binding arbitration conducted pursuant to the provisions of the Federal Arbitration Act, 9 U.S.C. Section 1, et seq. and according to generally accepted arbitration procedures, such as those promulgated by the American Arbitration Association. . .

[18], Ex. 1 at p. 3.

Also pertinent is the fifth page of the agreement, which is entitled "Notice of Manufacturer's Warranty" and advised Banks that she was "purchasing a new mobile home that includes a one (1) year Manufacturer's Warranty." *Id*. at p. 5. According to Gerald Cummings, Cavalier's Customer Care Manager, "[t]hat Warranty was included in Banks's Homeowner's Manual, which was shipped inside the kitchen drawer of the home when it left the Hamilton facility." [29], Ex. 1 at p. 1. The warranty contains a dispute resolution agreement, which provides that disputes between the parties (Cavalier and Banks) are subject to mediation and then, if necessary, binding arbitration.

2

On September 12, 2019, Banks, along with her family, moved into the manufactured home. She contends that, almost immediately after moving in, she began to experience issues with the home. More specifically, Banks alleges that "cracks appeared in the ceilings and walls" and "water began coming into [the] home through light fixtures whenever it rained." [23], Ex. 1 at p. 3. She avers that she "tried to work with Regional for years to informally resolve the dispute and filed a complaint with the Mississippi Fire Marshal to try to have her home fixed like Regional and Cavalier promised to do prior to her purchasing the home[.]" [35] at p. 3.

Ultimately, according to Banks, the Defendants did not fulfill their obligations associated with the home, necessitating that she institute this litigation. In her Complaint [2], Banks asserts claims for breach of contract, breach of express warranties, breach of implied warranties, negligence, gross negligence, and violations of the Magnuson-Moss Warranty Act. After removing the case to this Court, the Defendants filed the present Motions [18, 29] seeking to compel arbitration.

*Analysis and Discussion*

Prior to addressing the merits of the Defendants' request, the Court will address a preliminary matter concerning the applicable law.

I.    *Preliminary Matter*

Banks takes the position that the Federal Arbitration Act ("FAA") is inapplicable here. The Defendants disagree.

Section 2 of the FAA provides:

> A written provision in any maritime transaction or a contract *evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

3

9 U.S.C. § 2 (emphasis added).

Thus, by its plain language, the FAA is applicable if the parties' transaction "involv[es] commerce." *Id*. Furthermore, the Supreme Court applies an "expansive reading" to § 2. *See Mendez v. Wal-Mart Assoc., Inc.*, 2018 WL 7288583, at *4 (W.D. Tex. Nov. 28, 2018) (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 113, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001)).

Banks contends that the transaction did not involve interstate commerce because she, a Mississippi resident, "purchased her manufactured home in Mississippi, from a Mississippi company" and "[t]here is no evidence in the record that the manufactured home was ever involved in interstate commerce or that the purchase involved interstate commerce." [24] at p. 9.

However, in his Declaration, Gerald Cummings—who, again, is Cavalier's Customer Care Manager—stated that Banks' home was manufactured in Hamilton, Alabama "using component materials and products from suppliers in multiple states." [29], Ex. 1 at p. 1. The home was then transported across state lines before being sold to Banks in Tupelo, Mississippi. Notably, Banks has presented no evidence to contradict the assertions in Cummings' Declaration.

Considering Cummings' uncontradicted statement explaining that the transaction did indeed involve interstate commerce, along with the Supreme Court's directive to interpret § 2 expansively, the Court has no trouble concluding that the FAA governs this dispute. Stated concisely, this transaction involved interstate commerce.[1]

---

[1] The Court also notes that the parties stipulated in the agreement itself that the transaction involved interstate commerce: "Customer acknowledges and agrees that the transaction between the parties hereto is a matter involved in and pertaining to interstate commerce. Customer thus acknowledges that all aspects of the transaction are involved in, affect, or have a direct impact upon, interstate commerce." [18], Ex. 1 at p. 3.

II.    Standard under the FAA

"[T]he FAA expresses a strong national policy in favor of arbitration, and any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Long v. Allianz Life Ins. Co. v. North America*, 2008 WL 2910579, at *1 (N.D. Miss. July 25, 2008) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10, 105 S. Ct. 852, 79 L. Ed. 2d 1 (1983); *Mouton v. Metro. Life Ins. Co.*, 147 F.3d 453, 456 (5th Cir. 1998)).

"Under the FAA, courts conduct a two-prong arbitration inquiry, determining first, whether the parties intended to arbitrate the dispute, and second, if they did intend to arbitrate, whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Begole v. North Miss. Med. Ctr., Inc.*, 2018 WL 1463355, at *1 (N.D. Miss. Mar. 23, 2018) (citations and quotation marks omitted); *see also Long*, 2008 WL 2910579 at *1 ("The Fifth Circuit has directed that courts are to perform a two-step inquiry to determine whether parties should be compelled to arbitrate a dispute.").

First, "the court must determine whether the parties agreed to arbitrate the dispute." *Long*, 2008 WL 2910579 at *1 (citing *OPE Int'l LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 445 (5th Cir. 2001)). Under this first prong, "the court must determine whether a valid agreement to arbitrate exists, and whether the dispute in question falls within the scope of that arbitration agreement." *Id.* (citing *OPE*, 258 F.3d at 445; *Pennzoil Exploration and Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1065 (5th Cir. 1998)); *see also Reed v. Johnson*, 2016 WL 913232, at *2 (N.D. Miss. Mar. 9, 2016). Notably, "[t]hese issues are controlled by 'ordinary state-law principles that govern the formation of contracts.'" *Reed*, 2016 WL 913232 at *2 (quoting *Graves v. BP America Inc.*, 568 F.3d 221, 222 (5th Cir. 2009)).

Next, "[i]f the court finds that the parties agreed to arbitrate the claims, it must then consider whether any federal statute or policy renders the claims nonarbitrable. In conjunction with this inquiry, a party seeking to avoid arbitration must allege and prove that the arbitration provision itself was a product of fraud or coercion; alternatively, that party can allege and prove that another ground exists at law or in equity that would allow the parties' contract or agreement to be revoked." *Id*. (citing *OPE*, 258 F.3d at 446; *Sam Reisfeld & Son Import Co. v. S.A. Eteco*, 530 F.2d 679, 680-81 (5th Cir. 1976)).

### III.     Application

Because the Defendants' respective requests are based on two different agreements, the Court will employ the two-step inquiry separately.

### A.     Regional's Motion [18]

The Court begins with Regional's agreement with Banks.

### i.     First Prong

Under the first prong, the Court must look to the following sub-prongs: (1) whether a valid agreement to arbitrate exists; and (2) if so, whether the dispute falls within that agreement. *See Reed*, 2016 WL 913232 at *2. Banks attacks the agreement on both sub-points.

### a.     Whether a valid agreement to arbitrate exists

First, Banks contends that no valid agreement to arbitrate exists because "(1) no consideration was given by Regional for Banks's alleged agreement to arbitrate, (2) the Agreement does not expressly preclude litigation in favor of binding arbitration, making it indefinite and ambiguous, and (3) the parties did not mutually assent to be bound by the terms of the agreement." [24] at p. 11. These arguments go to three of the essential elements of a contract under Mississippi law: "[t]he elements of a contract are '(1) two or more contracting parties, (2) consideration, (3)

6

an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation.'" *LAGB, LLC v. Total Merchant Servs., Inc.,* 284 So. 3d 720, 724 (Miss. 2019) (quoting *Adams Cmty. Care Ctr., LLC v. Reed*, 37 So. 3d 1155, 1158 (Miss. 2010)) (additional citations omitted).

As to the purported lack of consideration, Banks contends that Regional "only offers a conclusory statement alleging that consideration for the alleged arbitration agreement was Banks' receipt of a manufactured home itself when, in fact, the consideration for the delivery and installation of the agreed upon manufactured home was Banks's payment of $126,731.75, not her alleged agreement to arbitrate disputes arising from the transaction." [24] at p. 11.

The Court finds this argument disingenuous. The purchase agreement is a six-page document that both parties signed. There were multiple aspects to it—a purchase price, obligations for delivery and installation, and, notably (among other things), an arbitration agreement. This is, in the Court's view, simply one aspect of the parties' entire agreement. Despite asking the Court to sever the arbitration portion of the purchase agreement from every other aspect of it, Banks cites no authority to support that position. Rather, the applicable law supports the contrary conclusion, as "under general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together." *Swindle v. Harvey*, 23 So. 3d 562, 568 (Miss. Ct. App. 2009) (quoting *Doleac v. Real Estate Professionals, LLC*, 911 So. 2d 496, 504 (Miss. 2005)). The arbitration agreement was contained within the parties' purchase agreement wherein each party agreed to "give up" certain things. Banks' lack of consideration argument is easily rejected.[2]

_____

[2] It is also noteworthy that separate consideration existed as to the arbitration agreement itself as the parties made mutual promises to each other to arbitrate their claims against each other. In other words, Banks agreed to arbitrate her potential claims against Regional, but Regional also agreed to arbitrate its potential claims against her.

Next, Banks argues that the arbitration agreement "does not expressly preclude litigation in favor of binding arbitration, making it indefinite and ambiguous." *Id*. In pertinent part, the agreement provides:

> Customer and Regional Enterprises, LLC agree that any and all claims, demands, disputes or controversies of every kind or nature between them, including but not limited to, tort and contract claims; claims based on federal, state or local statute, law, order, ordinance or regulations; and claims arising from, concerning or relating to any of the negotiations involved in the transaction, the terms and provisions of agreements, the arrangements for financing, the performance of the agreements of condition of the Home, or any other aspect of the transaction *shall be, at the request of either party, settled by binding arbitration* conducted pursuant to the provisions of the Federal Arbitration Act, 9 U.S.C. Section 1, et seq. and according to generally accepted arbitration procedures, such as those promulgated by the American Arbitration Association. . .

[18], Ex. 1 at p. 3 (emphasis added).

It is difficult to imagine a way in which the agreement could have more clearly indicated to Banks that she was agreeing to arbitrate any claims that may arise against Regional. It is also noteworthy that this provision is on its own page of the purchase agreement with "**ARBITRATION AGREEMENT**" on the top of the page. The Court struggles to see any way in which the agreement was indefinite as to arbitration being the manner in which any disputes would be resolved. Banks' argument on this point is rejected.

Third, Banks contends that the parties did not mutually assent to be bound by the terms of the agreement. On this point of contention, Banks argues:

> In this case, Regional told Banks that the Arbitration Agreement meant that she could not sue Regional for any reason if her home was damaged or installed improperly. Banks was not offered an opportunity to read the Arbitration Agreement or to obtain legal advice regarding its terms before it was presented to her to sign. She was pressured to sign the Arbitration Agreement in order to complete the lengthy closing process for the purchase of her home. Banks did not believe Regional's employee when they told her that

> the Arbitration Agreement precluded her from enforcing her rights under the contract, but signed the document because she was under pressure to do so. These facts do not show intent by Banks to be bound by the terms of the Arbitration Agreement as it was explained to her.

[24] at p. 13.

"The mutual assent of each of the contracting parties to the terms of the contract is essential to the formation of a valid contract and is determined by considering whether the parties mutually agreed to the terms offered and accepted." *JP&G LLC v. Voss*, 331 So.3d 569, 579 (Miss. Ct. App. 2021) (quoting *Blake v. Murphy Oil USA Inc.*, 2010 WL 3717245, at *3 (N.D. Miss. Sept. 14, 2010)) (quotation marks and additional citations omitted). Here, both parties signed the purchase agreement, which the Court views as evidence favoring mutual assent. *See*, *e.g.*, 3A MS Prac. Encyclopedia MS Law § 21:9 (3d ed.) ("Mutual assent is often evidenced by a written contract signed by all parties.").

Importantly, "[c]ourts are obligated to enforce a contract that is executed by legally competent parties containing clear and unambiguous terms, and parties are bound by its provisions." *Williams v. Williams*, 37 So. 3d 1196, 1200 (Miss. Ct. App. 2009) (citing *Ivison v. Ivison*, 762 So. 2d 329, 335 (Miss. 2000)). "The meaning of a contract is determined using an objective standard, rather than taking into consideration a subjective intent or party's belief that may conflict therewithin." *Id.* (citing *Palmere v. Curtis*, 789 So. 2d 126, 131 (Miss. Ct. App. 2001)). Applying this standard, Banks' alleged subjective belief that the arbitration agreement was not enforceable does not preclude its enforcement.

Her contention regarding the failure to read the agreement likewise fails. "Under Mississippi law, [] parties to a contract have an inherent duty to read the terms of a contract prior to signing; that is, a party may neither neglect to become familiar with the terms and conditions

and then later complain of lack of knowledge, nor avoid a written contract merely because he or she failed to read it or have someone else read and explain it." *MS Credit Ctr., Inc. v. Horton*, 927 So. 2d 167, 177 (Miss. 2006) (citing *Titan Indem. Co. v. City of Brandon, Miss.*, 27 F. Supp. 2d 693, 697 (S.D. Miss. 1997)). Thus, Banks cannot preclude enforcement of an otherwise binding agreement by simply stating that she failed to read its terms. The Court rejects Banks' attempt to prevent enforcement of the agreement based on lack of mutual assent.

> b.    *Whether the parties' dispute falls within the arbitration agreement*

Having rejected all of Banks' arguments opposing the formation of a valid arbitration agreement, the Court turns to the second sub-point under the first prong—that is, whether the present dispute falls within the agreement.

The language of the arbitration provision itself is extremely broad, covering "any and all claims, demands, disputes or controversies of every kind or nature between them, including but not limited to, tort and contract claims; claims based on federal, state or local statute, law, order, ordinance or regulations; and claims arising from, concerning or relating to any of the negotiations involved in the transaction, the terms and provisions of agreements, the arrangements for financing, the performance of the agreements of condition of the Home, or any other aspect of the transaction[.]" [18], Ex. 1 at p. 3.

Arguing that the present dispute falls outside the scope of the arbitration agreement, Banks relies heavily on the language of the fourth page of the purchase agreement which, as noted above, is entitled "Delivery Ticket/Buyer's Responsibilities." Banks notes that that page lists nine contractual obligations with which Regional was required to comply, such as "preparing the Dirt Pad according to State regulations" and "delivering and setting up the Home at the delivery address," among others. [24] at p. 6-7. Banks contends that the substance of this lawsuit concerns

Regional's failure to comply with the nine contractual obligations set forth within the "Delivery Ticket/Buyer's Responsibilities" document. Then, Banks points out that "[t]he Delivery Ticket references the Notice of Manufacturer's Warranty (on the next page in the sequence) but does not refer to nor reference the Arbitration Agreement itself, nor does the Delivery Ticker refer to or include any attachments. The Arbitration Agreement itself does not refer to the Delivery Ticket." [24] at p. 7. Banks then jumps to the conclusion that "[c]laims resulting from performance of Contract or warranting regarding the Delivery Ticket, are simply not subject to the Arbitration Agreement by the Delivery Ticket's own terms[.]" *Id*.

In essence, Banks' argument is that the Delivery Ticket/Buyer's Responsibilities page of the purchase agreement constitutes a separate and distinct agreement, not subject to the terms of the arbitration agreement. The Court has already addressed this argument in connection with Banks' lack of consideration argument, noting that the position is inconsistent with Mississippi law. As provided above, "under general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together." *Swindle*, 23 So. 3d at 568 (citations omitted). The Court reaches the same conclusion here. To adopt Banks' argument, the Court would have to ignore the broad language of the Arbitration Agreement.

The parties dispute clearly falls within the scope of the arbitration agreement.

ii.     *Second Prong*

Having determined that the parties agreed to arbitrate the present dispute, the Court must "assess whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *OPE*, 258 F.3d at 446 (quoting *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257-58 (5th

Cir. 1996)) (additional citations and quotation marks omitted). Banks contends that the arbitration provision "is unconscionable and cannot be enforced as a matter of State law." [24] at p. 14.

"Mississippi recognizes that 'unconscionability can be procedural or substantive.'" *Begole v. North Miss. Med. Ctr., Inc.*, 761 F. App'x 248, 251 (5th Cir. 2019) (quoting *Covenant Health & Rehab of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So. 3d 695, 699 (Miss. 2009)). "Procedural unconscionability may be proved by showing a lack of knowledge, lack of voluntariness, inconspicuous print, the use of complex legalistic language, disparity in sophistication or bargaining power of the parties and/or a lack of opportunity to study the contract and inquire about the contract terms." *Id*. (quoting *E. Ford, Inc. v. Taylor*, 826 So. 2d 709, 714 (Miss. 2002)). "Substantive unconscionability may be proved by showing the terms of the arbitration agreement to be oppressive." *Caplin v. Enterprises, Inc. v. Arrington*, 145 So.3d 608, 614 (Miss. 2014) (quoting *Taylor*, 826 So. 2d at 714).

Banks argues that the arbitration agreement is both procedurally and substantively unconscionable. As to procedural unconscionability, Banks argues:

> First, Banks was unaware prior to being presented the pre-printed Arbitration Agreement at closing that she would be expected to agree to binding arbitration of any dispute that may arise between herself and Regional in order to purchase her home. She stated during closing when confronted with the Arbitration Agreement that she did not want to sign it — showing involuntariness. The language of the Arbitration Agreement does not include explicit language stating that by signing it Banks would waive her right to judicial determination of her potential claims. The Arbitration Agreement is not written in simple easily understandable terms and is often contradictory. Banks is an unsophisticated home purchaser who did not have experience with contracts or arbitration clauses and was in the weaker negotiating position at the closing. When Banks attempted to oppose signing the Arbitration Agreement, Regional stated that she could not purchase the home she worked so hard to get — that the contract was on a "take it or leave it" basis. Banks was unable to study the terms of the Arbitration Agreement or postpone closing so that she might seek legal counsel. Finally,

12

> Banks was eight months pregnant at the time she was presented with the contract of adhesion containing the Arbitration Agreement and needed to complete the purchase of her home so that she and her newborn would have somewhere to live.

[24] at p. 15 (internal citations omitted).

Banks attached to her Response [23] an Affidavit, wherein she stated that she was under stress at the closing, that she was not given advanced notice that the purchase agreement contained an arbitration agreement, and that she was advised that the deal on her home would fall through if she did not sign the agreement. She also stated in the Affidavit that she was eight months pregnant at the time and was concerned about not having a place for her child to live if she did not sign the agreement.

Regional disputes these allegations. Attached to its Reply [27] is an Affidavit of Lane Derrick, who describes himself as an "agent of Regional Enterprises, LLC." [27], Ex. 1 at p. 1. In his Affidavit, Derrick states that he was present at the closing and that the closing itself was recorded pursuant to Regional's customary business practices. He then provides a further explanation:

> 4. Pursuant to the transaction, Banks executed a Purchase Agreement consisting of 6 pages which is attached as Exhibit "A" hereto. The signing of these documents is referred to as "the closing". The audio of the closing was recorded, per customary business practices. The recording is kept as a business record with the customer file and Banks consented to the recording of the closing.

> 5. At the closing Mrs. Banks was observed as being positive about her home purchase and overall experience, and seemed to be comfortable in the setting. As can be heard on the recording of the closing, I talk to Banks and present the Purchase Agreement, including the arbitration agreement to her. Banks does not oppose the arbitration agreement verbally during the closing. There is never any mention made that she had to sign the documents or could not take the documents with her for review. Banks did not ask about

her right to sue or that she did not agree to the arbitration agreement. Banks did not ask "what would happen if I did not sign the document?" I never told her that "if [she] did not sign the agreement that the deal on [her] home would fall through and that [she] would not be able to complete the purchase of [her] home." During the closing, the documents were identified by me and handed to Banks for her review and signature.

6.    As for the presentation of the arbitration agreement, I state on the recording "This is our Arbitration Agreement which y'all already done one of these it's just for us. It's just saying if there is a dispute between y'all and us about the home we'll hire a third party to come in as a settlement agent to resolve the issue." The Arbitration Agreement is handed to Banks and signed by her. There is no question asked by Banks or any statement made by Banks questioning the document in any way.

7.    The recording continues through the closing wherein Banks and the Regional representatives have friendly conversations about the home and all disclosures made and signed at the closing.

[27], Ex. 1 at p. 1-2.

As these quotations make clear, the parties present vastly different versions of events regarding the closing.

Notably, although Regional heavily disputes Banks' explanation as to the way in which the closing unfolded and it apparently has in its possession an audio recording of the closing, Regional did not attach the audio recording itself to its Reply [27]. The failure to attach that recording gives this Court concern, as the recording would presumably be probative evidence as to the veracity of each party's contentions.

Although not synonymous, the Court finds noteworthy a relatively recent decision of the District Court for the Southern District of Mississippi. *See Byars v. Asbury Mgmt. Servs., LLC*, 2020 WL 127989 (S.D. Miss. Jan. 10, 2020). There, the plaintiff, Byars, alleged that during her

term of employment with the defendants (collectively "Asbury"), she was subjected to sexual harassment. *Id*. at *1. After Byars filed suit, Asbury argued that the claims were subject to binding arbitration because Byars signed an arbitration agreement on the first day of her employment. *Id*. Asbury produced an arbitration agreement bearing Byars' digital signature. *Id*. Byars opposed arbitration, arguing that she never signed the agreement. *Id*. at *2. As articulated by the district court, "[t]here is a dispute as to whether the parties agreed to arbitrate. Byars states in her sworn Affidavit that she did not receive/read (electronically or otherwise) or sign (digitally or otherwise) the disputed arbitration agreement. However, Asbury states that Byars did acknowledge that she read the Agreement and that she signed it with an electronic signature using a password that she created and that was unique to her." *Id*. (quotation marks omitted).

Recognizing this dispute regarding whether the parties agreed to arbitrate, the district court ordered that the parties engage in limited arbitration-related discovery. In doing so, the court noted that "courts in this district have generally denied arbitration-related discovery absent a compelling showing that such discovery is required." *Id*. at *3 (quoting *American Gen. Life Ins. Co. v. Harper*, 2016 WL 430609, at *2 (5th Cir. Feb. 3, 2016); *Bell v. Koch Foods of Miss., LLC*, 2009 WL 1259054, at *3 (S.D. Miss. May 5, 2009)) (quotation marks omitted). However, the court held that Byars' contention that she never signed the arbitration clause at issue went to the very existence of an arbitration agreement and therefore ordered that the parties engage in limited arbitration-related discovery as to that issue. *Id*.

This Court is cognizant that neither party has requested arbitration-related discovery. However, similar to the concerns regarding the existence of an arbitration agreement in *Byars*, the Court harbors concerns as to the circumstances surrounding Banks' execution of the purchase agreement. The Court has before it competing contentions (in the form of Affidavits) as to the

15

closing, yet it does not have an audio recording that would presumably provide significant insight as to the way in which the closing unfolded. In light of these discrepancies, the Court finds it appropriate to order the parties engage in limited arbitration-related discovery. The discovery shall be limited to facts related to Banks' unconscionability arguments.

Notably, Banks shall *not* be permitted to engage in discovery pertaining to the issues that the Court has previously resolved in this Order and Memorandum Opinion. Stated differently, the discovery is very limited. The Magistrate Judge will hold a conference and enter a separate Order regarding the parameters of this limited discovery.[3]

For these reasons, Regional's Motion [18] is DENIED *without prejudice*. Following the discovery period, Regional may refile its request to compel arbitration. If Regional chooses to do so, it shall attach to that filing a copy of the audio recording for the Court's review. Furthermore, in briefing a re-filed motion, the parties shall focus only on the issues left open via today's ruling. In other words, the parties shall not attempt to relitigate the issues that the Court has already resolved herein.

      B.     *Cavalier's Motion [29]*

Cavalier also seeks a declaration that Banks' claims against it are subject to binding arbitration.

As indicated above, Cavalier's request is based on a different arbitration agreement than Regional's request. The fifth page of the purchase agreement between Banks and Regional is entitled "Notice of Manufacturer's Warranty." [18] at p. 5. That Notice provides as follows:

> 1.    You are purchasing a new mobile home that includes a one (1) year Manufacturer's Warranty.

---

[3] Banks also makes arguments concerning substantive unconscionability. In particular, she contends that she cannot afford the arbitration costs, among other things. She has provided no evidence to support those contentions. Limited discovery will provide an opportunity for Banks to develop that argument and for Regional to be able to oppose it.

2.      Included with your mobile home is your Home Owner's
        Manual with a "30 Day Inspection Punch List" that should
        be completed and mailed to the manufacturer.

3.      If your mobile home is found to be defective after this
        transaction, the Buyer should contact the manufacturer if it
        is within the one (1) year Manufacturer's Warranty period.
        After this period, Buyer assumes the entire cost of servicing
        or repair to the home.

        . . .

8.      Buyer should follow the instructions contained in the Home
        Owner's Manual to maintain the Manufacturer's Warranty.

[18], Ex. 1 at p. 5.

The page also contains an acknowledgement section, which provides:

> By signing below, the Buyer agrees to hold the seller harmless from
> any loss and the Buyer acknowledges that he/she has read each and
> every word in the above notice of Manufacture's [sic] Warranty
> Agreement and that the Buyer fully understands all of the language
> in this agreement; furthermore, the Buyer also acknowledges that
> he/she is fully aware that there will be absolutely no service,
> warranty or improvements made by Regional to the home being sold
> of any kind: limited, expressed or implied.

*Id*.

According to Cavalier, the homeowners manual was shipped inside the kitchen drawer of the mobile home when it left Cavalier's facility. In her Affidavit, Banks states that she "found a Homeowners Manual from Cavalier which included its year warranty." [34], Ex. 1 at p. 2. The homeowners manual indeed included within it a warranty entitled "One Year Limited Warranty and Binding Dispute Resolution Agreement." [29], Ex. 3 at p. 1. The binding dispute resolution agreement includes language mandating that claims against Cavalier be pursued via arbitration. It is undisputed that Banks did not sign the homeowners manual nor did she sign the warranty contained within it.

Cavalier contends that the dispute resolution agreement contained within the warranty is enforceable and that Banks is estopped from opposing its enforceability since she sought benefits under the warranty. Banks asserts otherwise. She contends that she never agreed to arbitrate any potential claims against Cavalier and that she was unaware of the dispute resolution agreement contained within the homeowners manual at the time of closing. In other words, she takes the position that she did not assent to arbitration in connection with any potential warranty claims. She likewise disagrees with Cavalier's estoppel defense, as well as raising an unconscionability argument.

At the outset, the Court notes that the mere fact that Banks did not sign a document containing an arbitration agreement with Cavalier is not dispositive, as a nonsignatory may be bound by an arbitration provision pursuant to the direct benefits estoppel doctrine. *See*, *e.g.*, *Terminix Int'l, Inc. v. Rice*, 904 So.2d 1051, 1058 (Miss. 2004). The Mississippi Supreme Court has described the doctrine as follows: "direct-benefit estoppel involves non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Freese v. Mitchell*, 2014 WL 1946593, at *8 n. 8 (Miss. 2014) (citations omitted).

The Court also notes that each party points to persuasive authority to support their respective positions.

On one hand, Banks urges this Court to consider the Tennessee Court of Appeals decision in *Capps v. Adams Wholesale Co., Inc.*, 2015 WL 2445970 (Tenn. Ct. App. 2015). There, the plaintiffs purchased decking material "from Greeneville Builders Supply. The product was manufactured by TAMKO Building Products, distributed through Dealer's Warehouse Corporation, and installed by Todd Brown. Plaintiffs were advised that the product came with a

18

lifetime warranty but were not given any documentation of the warranty prior to the purchase." *Id.* at *1. Each bundle of the product instead contained the following notice:

> This product is covered by a TAMKO limited warranty. All other warranties are expressly excluded. You may obtain a copy of the limited warranty from your dealer, by calling 800-641-4691, or from our web site: tamko.com.

*Id.*

The warranty itself contained an arbitration provision. *Id.* After becoming dissatisfied with the product, the plaintiffs filed suit against the manufacturer for negligence and breach of warranty, to which the manufacturer responded with a motion to compel arbitration. *Id.* The trial court denied the motion, and the manufacturer appealed. *Id.* at *2. The Tennessee Court of Appeals affirmed, providing the following reasoning:

> In this case, Plaintiffs were not provided with a copy of the limited warranty that contained the arbitration agreement prior to their purchase or when the product was delivered for installation. The notices provided on the product did not reference an arbitration agreement or provide any indication that acceptance of the product was tantamount to acceptance of an arbitration agreement. Plaintiffs, like any ordinary consumer, did not consult their warranty to contact the manufacturer of the product until after they experienced an issue, approximately six months after the product was installed. Under these specific circumstances, we hold that an arbitration agreement was not formed because there was never an objective mutual assent to the terms of the agreement when Plaintiffs were not notified that such an agreement existed.

*Id.* at *3.

On the other hand, Cavalier asks the Court to give deference to the Alabama Supreme Court's decision in *Southern Energy Homes, Inc. v. Ard*, 772 So.2d 1131 (Ala. 2000). The facts of *Ard* are similar to the case at bar—the plaintiffs (the Ards) purchased from a retailer (Southland) a mobile home that had been manufactured by Southern Energy. *Id.* at 1132. A homeowner's

manual contained a warranty issued by Southern Energy to the Ards. *Id*. Also included in the homeowner's manual was an arbitration agreement. *Id*.

The trial court declined to enforce the arbitration agreement against the Ards, but the Alabama Supreme Court reversed. *Id*. at 1134. In doing so, the court noted: "[w]hile the Ards' *arguments* dispute their assent to the arbitration language and attack the effectiveness of the delivery of the arbitration language, no evidentiary materials of record support the Ards in this regard except the absence of any signatures by the parties in the Home Owner's Manual." *Id*. at 1134 (emphasis in original). After noting that issue, the Alabama Supreme Court held that the Ards were bound to the arbitration provision for they "accepted the benefits of the warranty containing the arbitration provisions" and "cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions." *Id*. (citations omitted).

As these cases make clear, different courts have reached different conclusions on claims regarding this issue. Of course, neither of those cases are binding on this Court.

As far as binding authority, Cavalier urges this Court to consider the Mississippi Supreme Court's decision in *Terminix*. There, David Rice signed a contract with Terminix, pursuant to which Terminix would protect David and his wife, Cynthia's, home against termite infestations in exchange for an annual fee. *Id*. at 1053. The contract contained an arbitration provision. *Id*. The Rices eventually discovered extensive termite damage to their home and, after unsuccessfully attempting to resolve the matter with Terminix, filed suit in the Circuit Court of Jones County. *Id*. The trial court denied Terminix's motion to compel arbitration, holding (1) that the Rices did not know they were submitting to arbitration when David signed the contract; (2) that the arbitration clause was unconscionable; and (3) that the contract was one of adhesion. *Id*.

20

The Supreme Court reversed. *Id*. Among other issues, the Supreme Court addressed the Rices' contention that Cynthia should not be bound by the arbitration provision since she did not sign the contract. *Id*. at 1057-58. The court easily rejected that argument, holding that Cynthia was bound by the arbitration provision pursuant to ordinary principles of contract law, including equitable estoppel. *Id*. at 1058.

This Court finds *Terminix* distinguishable. Unlike David Rice, at the time Banks signed the purchase agreement, she had no knowledge whatsoever that the manufacturer's warranty contained a dispute resolution agreement. She had no way to know of its existence. The Notice of Manufacturer's Warranty contained various pieces of information related to the manufacturer's warranty, such as a thirty-day inspection punch list, but it contained *no* indication whatsoever that the manufacturer's warranty contained within it a dispute resolution agreement. It likewise did not provide a copy of the manufacturer's warranty nor was Banks offered an opportunity to request to review the manufacturer's warranty. This is quite different than *Terminix*, where David Rice signed a contract that indisputably contained an arbitration provision.

The pertinent facts of this case are rather simple. Banks signed a purchase agreement with Regional that placed her on notice of a one-year manufacturer's warranty. However, despite providing information as to several aspects of the warranty, the purchase agreement provided no notice whatsoever that the warranty contained a dispute resolution agreement. Presumably, the purchase agreement *could* have done so, but it undeniably did not.[4] Under Cavalier's theory, Banks should nevertheless be subject to the dispute resolution agreement contained in the manufacturer's warranty because she has since sought benefits under the warranty. Stated differently, even though

---

[4] In making this observation, the Court is of course cognizant that the purchase agreement was presumably prepared by Regional—not Cavalier; however, the Court's greatest concern at this stage is the lack of knowledge provided to Banks.

Banks contracted for a warranty and was not made aware of the arbitration agreement contained within the warranty at the time of contracting, she should still be forced to arbitrate her claims because she actually sought to enforce the contractual rights to which she agreed. This is inequitable, and the Court declines to sanction such a theory in the absence of binding authority that it do so. Cavalier has pointed to no such authority.[5]

Ultimately, although the FAA established a strong policy favoring arbitration requiring courts to "rigorously enforce agreements to arbitrate," courts cannot enforce an arbitration agreement against a party who did not agree to arbitrate. *East Ford, Inc. v. Taylor*, 826 So.2d 709, 713 (Miss. 2002) (quoting *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226, 107 S. Ct. 2332, 2337, 96 L. Ed. 2d 185 (1987)). At closing, Banks was made aware of the existence of a manufacturer's warranty. This was part of her consideration and agreement to purchase the manufactured home. But she was not provided a copy of the manufacturer's warranty nor was she provided notice that it contained a dispute resolution agreement. She did not agree to arbitrate her claims against Cavalier, and the dispute resolution agreement is therefore not enforceable against her. *See JP&G, LLC v. Voss*, 331 So. 3d 569, 579 (Miss. Ct. App. 2021) (quoting *Pre-Paid Legal Serv. Inc. v. Battle*, 873 So. 2d 79, 83 (Miss. 2004)) ("A party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). Cavalier's Motion [29] is DENIED.

---

[5] Had Banks been placed on notice of the arbitration provision in the manufacturer's warranty at the time of closing, the outcome might very well be different. However, it is undisputed that she was *not* aware of it at the time of contracting. This fact is critical to the Court's conclusion.

*Conclusion*

For the reasons set forth above, Regional's Motion to Compel Arbitration [18] is DENIED *without prejudice*. The Magistrate Judge will hold a status conference and set deadlines associated with the limited arbitration-related discovery ordered herein, as well as a deadline for Regional to re-file a motion to compel arbitration if it desires to do so. As indicated above, should Regional desire to re-urge a request for arbitration, it shall produce with such a request a copy of the audio recording of the closing.

Cavalier's Motion to Compel Arbitration [29] is DENIED. However, the Court will STAY all proceedings associated with Banks' claims against Cavalier until the arbitration issues associated with Banks' claims against Regional are resolved.[6]

SO ORDERED, this the 27th day of March, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE

---

[6] Banks' Motion for Leave to File Sur-Reply [31] and her Motion for Extension of Time [33] are DENIED AS MOOT.

23